```
                    THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF NEW JERSEY
```

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | HON. JEROME B. SIMANDLE |
| | : | |
| | : | Criminal No. 06-906 (JBS) |
| v. | : | |
| | : | |
| | : | **OPINION** |
| LUIS CARRION-SOTO, | : | |
| | : | |
| Defendant. | : | |

APPEARANCES:

CHRISTOPHER J. CHRISTIE
United States Attorney
By:  Deborah Prisinzano Mikkelsen,
     Assistant United States Attorney
     Ronald Chillemi,
     Assistant United States Attorney
401 Market Street, 4th Floor
Camden, New Jersey  08101

RONALD B. THOMPSON, Esq.
Law Office of Ronald Thompson
3003 Lincoln Drive West
Suite E
Marlton, NJ 08053
     Attorney for Defendant Luis Carrion-Soto

**SIMANDLE**, District Judge:

## I.   INTRODUCTION

On June 22, 2006, law enforcement officers from the Sheriff's Office in Florence County, South Carolina, conducted a search of a vehicle in which the defendant, Luis Carrion-Soto, was traveling as a passenger.  Among the evidence that the officers uncovered during the search were two packages, one of which contained 100 grams of heroin and another that contained

one kilogram of cocaine.  In a three-count superseding indictment filed on August 21, 2007, Mr. Carrion-Soto was charged with participating in a drug trafficking conspiracy and with possessing with the intent to distribute cocaine and heroin [Docket Item 17].

Mr. Carrion-Soto has moved the Court to suppress various statements that he made to law enforcement officers on the day of his arrest and on subsequent days, claiming that the statements were obtained illegally in violation of his Fifth Amendment rights [Docket Item 30].  In addition, Mr. Carrion-Soto has moved to suppress various pieces of evidence seized during the search of the vehicle on June 22, 2006, arguing that the search that produced the evidence was illegal under the Fourth Amendment of the Constitution [Docket Item 31].  The Government opposes the defendant's motions and argues that the evidence was obtained legally [Docket Items 24, 32, 33].  The Court conducted hearings on October 16, 22 and 25, hearing testimony from law enforcement witnesses and from Defendant himself.  For the following reasons, the Court denies the defendant's motions and finds all of the challenged evidence admissible.

## II.  BACKGROUND

The Court first summarizes the relevant facts that gave rise to the evidence that Mr. Carrion-Soto seeks to suppress.

### A.   Law Enforcement Officers' Testimony

1.    **June 22, 2006 Traffic Stop and Automobile Search**

At the suppression hearing before the Court on October 16, 2007, Corporal Wayne Drummond testified that on the morning of June 22, 2006, he was patrolling Interstate 95 in Florence County, South Carolina in an unmarked police vehicle when he observed a blue Lexus automobile driving south on the Interstate in excess of the speed limit.  (Tr. 148.)  Corporal Drummond activated his siren and "blue lights"[1] and followed the Lexus until it pulled over and stopped in the emergency lane on the side of the road.  (Id. at 148-49.)  Corporal Drummond, who was armed and wearing a Sheriff's uniform, approached the Lexus on the passenger's side, where he observed two people in the vehicle - Vergen Guzman in the driver's seat and Mr. Carrion-Soto in the passenger seat.  (Id. at 149-50.)  Mr. Carrion-Soto appeared to

---

[1]  There is an incomplete videotape recording of some of the pertinent events during the highway stop.  The Court has reviewed a composite tape [Ex. 10A] containing all known portions of the videos taken from Corporal Drummond's vehicle and from Corporal Jackson's vehicle at the scene.  Sergeant Brown testified that activating the "blue lights" in Corporal Drummond's vehicle automatically turns on a camera located in that vehicle.  (Tr. 55.)  On the morning of June 22, 2006, however, the videotape in the camera was nearly out of recording time, unbeknownst to Corporal Drummond, and the camera stopped recording after the Lexus had stopped.  (Id. at 192-93.)  Sergeant Brown testified that when the officers realized the camera had stopped functioning, Corporal Drummond replaced the tape.  (Id. at 65.)  The officers subsequently learned that roughly twenty-three minutes of unrecorded time had elapsed between the end of the first tape and the beginning of the second tape, including the moment when Mr. Carrion-Soto allegedly consented to the search of the automobile.  (Id. at 67, 85.)

be asleep when Corporal Drummond approached the car.  (<u>Id.</u> at
150.)

Corporal Drummond testified that he asked Ms. Guzman for her
driver's license and vehicle registration.  (<u>Id.</u>)  When Ms.
Guzman opened the glove compartment to obtain the registration
information, Corporal Drummond observed a four-inch stack of
United States currency in six individually bound substacks, with
the large stack bound together by rubber bands.  (<u>Id.</u>)  According
to Corporal Drummond, the quantity and packaging of the currency
aroused his suspicion that the occupants of the Lexus were
involved in unlawful activity, and he asked Ms. Guzman to exit
the vehicle in order to question her separately from Mr. Carrion-
Soto, who was by then awake.[2]  (<u>Id.</u> at 151-52.)  Standing at the
back of the Lexus, Corporal Drummond asked Ms. Guzman a series of
questions about her travel plans and her relationship with the
defendant.  (<u>Id.</u> at 53, 70, 152.)  Ms. Guzman informed Corporal
Drummond that she and Mr. Carrion-Soto had come from Pennsylvania
and were driving to Florida, although she did not know where in
Florida they were going, and stated that they planned to return

---

[2]  According to the officers' testimony, at some point
shortly after pulling the Lexus over, Corporal Drummond asked for
the assistance of fellow officers over his radio.  Corporal
Drummond testified that he observed the Lexus at 8:24 a.m., and
Sergeant Brown testified that he received a radio call from
Drummond at approximately 8:26 a.m.  (Tr. 52, 148.)  Sergeant
Brown arrived on the scene within five minutes, followed by
Corporals Jackson, Spell, and Weaver.  (<u>Id.</u> at 53.)

from Florida two days later.  (Id. at 153-55.)  Ms. Guzman also
informed Corporal Drummond that she and Mr. Carrion-Soto had been
in a romantic relationship for one year.  (Id. at 152.)  Corporal
Drummond testified that he then spoke separately with Mr.
Carrion-Soto, asking him the same questions he had posed to Ms.
Guzman.  (Id. at 155.)  Mr. Carrion-Soto informed Corporal
Drummond that they were driving to Daytona, Florida to visit his
uncle, that they had recently stopped at a roadside complex
called "South of the Border," and that he had been dating Ms.
Guzman for one-and-a-half months.  (Id. at 155-57.)

        According to Corporal Drummond, the combination of the
following factors led him to suspect that the car's occupants
were involved in criminal activity: the stack of currency; the
inconsistency between Ms. Guzman's and Mr. Carrion-Soto's
answers; the fact that Ms. Guzman did not know their ultimate
destination; the brevity of the couple's trip; the destination of
Daytona, which Corporal Drummond understood to be a "source" city
for narcotics; the couple's visit to South of the Border, which
Corporal Drummond believed to be a meeting place for drug
traffickers; and the "Patrolman's Benevolent Association" decal
on the dashboard of the Lexus, which Corporal Drummond knew to be
of the sort frequently utilized by drug traffickers to discourage
law enforcement officers from investigating their vehicles.  (Id.
at 154-57.)  After he posed his initial questions to Ms. Guzman

5

and Mr. Carrion-Soto, Corporal Drummond entered the information
about the traffic stop in the "mobile data" unit computer in his
car to verify the ownership of the Lexus.  (Id. at 158.)

Corporal Drummond testified that he sought and received
permission from Ms. Guzman to search the Lexus.  (Id. at 158-59.)
In response to questioning from Corporal Drummond, Ms. Guzman
stated that there were no guns or illegal substances in the car.
(Id. at 159.)  According to Corporal Drummond, he posed the same
questions to the defendant, who likewise stated that the car
contained no drugs or illegal substances.  (Id.)  Corporal
Drummond testified that he asked Mr. Carrion-Soto for permission
to search the car, and Mr. Carrion-Soto consented.  (Id.)
Sergeant Brown testified that he heard Corporal Drummond ask Ms.
Guzman and Mr. Carrion-Soto for permission to search the Lexus in
a non-threatening tone of voice and witnessed both parties
consent to the search.[3]  (Id. at 76, 84-85.)  According to

---

[3]  Both Sergeant Brown and Corporal Drummond testified that
their memories of Carrion-Soto's consent to search the Lexus had
been refreshed prior to the October 16, 2007 hearing.  Sergeant
Brown testified that before the hearing, he watched the video
recorded from Corporal Drummond's car, and while the conversation
occurred after the tape had stopped running, watching it restored
his memory of the event itself.  (Tr. 86.)  Corporal Drummond
testified that he reviewed his incident report from the arrest
prior to the hearing, which states that he asked the same
questions of Mr. Carrion-Soto as he had of Ms. Guzman, and Mr.
Carrion-Soto said "no to all narcotics questions."  (Id. at 190.)
This, according to Corporal Drummond, helped him recall that he
also asked for, and received, Mr. Carrion-Soto's consent to
search the Lexus.  (Id.)

Sergeant Brown, Ms. Guzman gave her consent between fifteen and twenty minutes after her car had been stopped, and Mr. Carrion-Soto consented about five minutes later.  (<u>Id.</u> at 85.)

According to Sergeant Brown's testimony, Ms. Guzman and Mr. Carrion-Soto were asked to stand outside the car while Corporals Drummond, Jackson, Spell, and Weaver searched the car.  (<u>Id.</u> at 87-88.)  Corporal Drummond searched the trunk of the car and found a duffel bag and a blue suitcase, which he then held up to Ms. Guzman and Mr. Carrion-Soto.  (<u>Id.</u> at 88-89.)  Corporal Drummond then asked who the luggage belonged to, and Ms. Guzman said that the duffel bag was hers, while Mr. Carrion-Soto claimed the suitcase; the officers did not seek Ms. Guzman's or Mr. Carrion-Soto's consent to open the luggage.  (<u>Id.</u> at 89-90, 194.) Corporal Drummond opened the duffel bag first and found no contraband.  (<u>Id.</u> at 89.)  He next opened the suitcase, which was not locked, and removed from the suitcase a cylinder that was wrapped in black tape.  (<u>Id.</u> at 90.)  Subsequent testing revealed that the cylinder contained more than 100 grams of heroin.

Believing that the cylinder contained narcotics, the officers placed Ms. Guzman and Mr. Carrion-Soto in handcuffs and advised them that they were not under arrest but were being placed in investigative detention.  (<u>Id.</u> at 91.)  At Sergeant Brown's suggestion, Corporal Drummond read to detained suspects the <u>Miranda</u> warnings from a "<u>Miranda</u> card" that Sergeant Brown

7

had handed to him.  (Id. at 91-93.)  Corporal Drummond read these warnings approximately forty minutes after the Lexus had first been stopped.  (Id. at 94.)  According to Sergeant Brown, Corporal Drummond's tone was non-threatening, and, apart from the application of handcuffs, the officers had not made a show of force or otherwise intimidated the suspects.[4]  (Id. at 93.) According to the officers' testimony, Mr. Carrion-Soto stated that he understood his rights and was willing to answer the officers' questions.  (Id. at 94.)  Mr. Carrion-Soto stated that he did not know what the cylinder contained, and when Sergeant Brown told him that he believed the cylinder contained heroin, Mr. Carrion-Soto stated that he thought that it contained a steroid for dogs.  (Id. at 95-96.)

Twenty-seven minutes after Ms. Guzman and Mr. Carrion-Soto had been placed in investigative detention and had been warned of their Miranda rights, Corporal Spell discovered a rectangular object wrapped in black tape under the rear passenger-side seat of the Lexus.  (Id. at 104-05.)  Subsequent testing revealed that the rectangular object was one kilogram of cocaine.  According to Sergeant Brown, shortly after the cocaine was discovered, Mr. Carrion-Soto told Corporal Jackson that he wished to speak with

---

[4]  Corporal Drummond can be seen and heard reading the Miranda rights in a calm tone of voice on the video recording from Corporal Drummond's car [Ex. 10A at 7:57:07].  Mr. Carrion-Soto can be seen nodding and mouthing "yes" when asked whether he understood his rights [id.].

Sergeant Brown, and, in the conversation that ensued, Mr. Carrion-Soto said that the kilogram of cocaine was his but denied ownership of the heroin. (Id. at 107.) Soon after making this admission to Sergeant Brown, Mr. Carrion-Soto made a similar confession to Corporal Drummond; this latter confession was captured on the video recording of the traffic stop by the camera in Corporal Drummond's vehicle. (Id. at 110; Ex. 10T.)

Sergeant Brown testified that after the heroin and cocaine were discovered, he examined the exterior of the car and the luggage with his patrol dog, Treez, a Belgian Malinois with substantial training in narcotics detection.[5] (Tr. 112.) According to Sergeant Brown, Treez "alerted" to the presence of narcotics near the trunk of the car, where the heroin had been found. (Id.) The officers also conducted a "luggage lineup" on the side of the road by placing the pieces of luggage between five and ten feet apart, and Treez "alerted" to the presence of narcotics next to the blue suitcase where the heroin had been found. (Id. at 113.)

---

[5] According to Sergeant Brown's testimony, when Treez "alerts" positively to the presence of narcotics, she has been proven accurate by the discovery of contraband between 70% and 80% of the time. (Tr. 113.) Of the remaining 20% to 30% of Treez's positive alerts, 80% to 85% have been explainable by the fact of the searched area's previous contact with narcotics. (Id.) This yields a rate of unexplained false positives of only 3% to 6% of Treez's overall alerts.

At the October 16, 2007 hearing, United States Drug
Enforcement Administration ("DEA") Task Force Officer Joseph M.
Koenig ("TFO Koenig") testified that his office was contacted on
the morning of the June 22, 2006 traffic stop because of the
drugs that were discovered and because Mr. Carrion-Soto was
reportedly interested in cooperating with the government.  (Id.
at 202-03.)  TFO Koenig testified that he arrived at the scene on
Interstate 95 at approximately 10:00 a.m. on the morning of June
22.  (Id. at 203.)  When he arrived on the scene, TFO Koenig
spoke with Sergeant Brown and Corporal Drummond about the stop
and resulting search of the Lexus.  (Id. at 204.)  According to
TFO Koenig's testimony, the officers only informed him that Ms.
Guzman had consented to the search of the car; they made no
mention of Mr. Carrion-Soto's consent.  (Id. at 206.)

After speaking with Sergeant Brown and Corporal Drummond,
TFO Koenig had a brief conversation with Mr. Carrion-Soto.  When
TFO Koenig asked the defendant if he had been read his Miranda
warnings, the defendant confirmed that one of the deputies read
him his rights from a yellow card and that he understood his
Miranda rights and wanted to cooperate.  (Id. at 207-08.)
According to TFO Koenig, Mr. Carrion-Soto stated that the cocaine
was his but that the heroin had been placed in his suitcase by
someone else without his permission.  (Id. at 209.)  Mr. Carrion-
Soto reiterated his interest in cooperating with the government,

10

and TFO Koenig informed him that the DEA would make the Court aware of any cooperation he provided.  (Id. at 209-210.)

### 2.   DEA Interview

After this brief conversation with the defendant at the scene of the traffic stop, TFO Koenig placed Mr. Carrion-Soto in the front seat of his car to transport him to the DEA offices for a full interview.  (Id. at 211.)  TFO Koenig and Mr. Carrion-Soto were the only people in the car when TFO Koenig transported him to the DEA office, and the defendant remained handcuffed during this ten- to fifteen-minute drive.  (Id. at 211-12.)  TFO Koenig testified that while he was being transported to the DEA office, Mr. Carrion-Soto expressed agitation over the fact that someone placed heroin in his luggage.  (Id. at 212.)  TFO Koenig also testified that he made no threats or promises to the defendant during this time.  (Id.)

At the DEA office, Mr. Carrion-Soto was taken to an interrogation room, where his handcuffs were removed.  (Id. at 212-13.)  TFO Koenig testified that he did not re-read the defendant his Miranda warnings because they had not taken an extended break.  (Id. at 214.)  Over the course of a one-and-a-half- to two-hour interview at which two other DEA employees were present, Mr. Carrion-Soto described his New Jersey-based drug dealing in significant detail, accounting for sales of approximately eighty kilograms of cocaine.  (Id. at 214-18.)  TFO

Koenig testified that the defendant was not permitted to accept calls on his cellular telephone during the interview, but that he made three calls at the direction of law enforcement officers and he permitted the officers to monitor those calls.  (Id. at 219.) According to TFO Koenig, during the interview, the law enforcement officers did not threaten Mr. Carrion-Soto or make promises regarding the effect of his cooperation.  (Id.)

TFO Koenig testified that, after interviewing Mr. Carrion-Soto, the DEA officers determined that his cooperation would be most helpful to the New Jersey office of the DEA, since the officers there were already aware of him and his drug-related activities.  (Id. at 219-20.)  Accordingly, it was determined that the defendant would be returned to the custody of the Florence County Sheriff's Office pending his appearance before a Florence County magistrate judge.  (Id. at 220.)  Mr. Carrion-Soto was instructed to contact DEA Special Agent Timothy Beach ("SA Beach") upon his return to New Jersey, and was provided SA Beach's telephone number.  (Id.)  TFO Koenig admitted under cross-examination that at the end of the interview, he stated to the defendant regarding his cooperation, "If you f*** me on this, you'll regret it for the rest of your life."  (Id. at 226.)

After the DEA interview, Mr. Carrion-Soto was charged with violating South Carolina controlled substances laws and incarcerated before appearing before the magistrate judge.  On

12

June 23, 2006, the defendant appeared before the magistrate and was released on a personal recognizance bond in order to return to New Jersey.

### 3.  Statements to SA Beach

At the October 22, 2007 hearing, SA Beach testified that at 11:00 p.m. on June 23, 2006, he received a telephone call from Mr. Carrion-Soto.  (Tr. 8.)  By this time Mr. Carrion-Soto had been released on bail and had returned to New Jersey on his own recognizance.  During the call, which lasted five minutes, Mr. Carrion-Soto reiterated his interest in cooperating with the government and provided SA Beach with detailed information regarding other drug traffickers with whom he had dealings in Cumberland County, New Jersey.  (Id. at 9-10.)  SA Beach testified that he did not read the defendant his Miranda warnings or otherwise discuss the defendant's constitutional rights during this call because he was not in custody or under arrest.  (Id. at 9.)  SA Beach further testified that during the telephone call, he made no threats, promises, or predictions to the defendant regarding his cooperation and employed no tricks or deception. (Id. at 11.)  SA Beach informed the defendant that he would be contacted early the following week to arrange a meeting with DEA investigators.  (Id. at 12.)

On June 27, 2007, SA Beach telephoned the defendant and instructed him to meet the DEA officers in the parking lot behind

13

the Wal-Mart in Hamilton, New Jersey.  (Id. at 13.)  Mr. Carrion-
Soto arrived at the parking lot in the blue Lexus, where SA Beach
and two other law enforcement officers were waiting.  (Id. at
14.)  SA Beach testified that when the defendant saw the three
officers waiting, he "put his head down" and stated that he
recognized Detective Gami Cruz, but when asked by SA Beach
whether he was still interested in speaking with the officers, he
answered affirmatively.  (Id. at 15.)  Mr. Carrion-Soto was asked
to follow SA Beach's car to the DEA office, and the three law
enforcement officers and the defendant each drove separately to
the office in Northfield, New Jersey, which was located
approximately thirty minutes from Hamilton.  (Id. at 16.)  At the
DEA office, Mr. Carrion-Soto was patted down to ensure that he
was unarmed, and was taken to a conference room for the
interview.  (Id. at 17, 33.)

    SA Beach testified that the interview at the Northfield
office lasted for two hours.  (Id. at 18.)  The interview was
attended by SA Beach, four additional law enforcement officers,
and Assistant United States Attorney Diana Carrig, who informed
the defendant that she was an attorney but otherwise did not
speak during the interview.  (Id. at 17, 35.)  At the beginning
of the interview, the defendant started to cry, stating that he
was upset because of the risk that his cooperation posed to his
children.  (Id. at 18.)  According to SA Beach's testimony, the

14

officers offered Mr. Carrion-Soto water and excused themselves
from the room in order to give him the opportunity to collect
himself, and a few minutes later, the defendant informed the
officers that he was prepared to continue the interview.  (Id. at
18-19.)  During the interview, the defendant provided detailed
information about his drug trafficking activities in New Jersey.
(Id. at 19.)  Mr. Carrion-Soto was not handcuffed during the
interview, and, according to SA Beach's testimony, he was "free
to leave at any time."  (Id. at 20-21.)  SA Beach testified that
no one spoke with Mr. Carrion-Soto about his constitutional
rights because, according to SA Beach, he was not in custody or
under arrest.  (Id. at 17.)  At the end of the two-hour
interview, Mr. Carrion-Soto was photographed and fingerprinted.
(Id. at 42-45.)  This information was taken, according to SA
Beach, in order for the DEA to process the defendant's
"confidential source establishment package."  (Id. at 43.)
Although the defendant had subsequent dealings with SA Beach and
other DEA agents, the Government does not seek to introduce any
statements made by the after the June 27, 2006 interview.

**B.   Mr. Carrion-Soto's Testimony**

     Mr. Carrion-Soto testified about his recollection of the
events in question, and his account differed in several respects
from those of the Government's witnesses.  First, the defendant's
testimony about the June 22, 2006 traffic stop is at odds with

the accounts of Corporal Drummond Sergeant Brown with regard to several facts.  According to Mr. Carrion-Soto's recollection, after the Lexus stopped on the side of Interstate 95, Corporal Drummond asked Ms. Guzman to exit the Lexus before asking for her license and vehicle registration.  (Id. at 93.)  He asked the defendant to find the vehicle registration information after Ms. Guzman had exited the vehicle, and once Mr. Carrion-Soto opened the glove compartment, Corporal Drummond observed the stack of United States currency and asked Mr. Carrion-Soto to exit the vehicle.  (Id. at 93.)  With both Ms. Guzman and Mr. Carrion-Soto out of the vehicle, and without seeking Mr. Carrion-Soto's consent, Corporal Drummond began searching the vehicle.  (Id. at 94-95.)  He discovered the suitcase in the trunk within two to three minutes, and without asking for the defendant's consent, opened the suitcase and discovered the cylinder containing the heroin.  (Id. at 96.)  According to Mr. Carrion-Soto's testimony, it was only after discovering the heroin that Corporal Drummond

contacted other law enforcement officers to ask for assistance.[6]
(Id.)  Sergeant Brown arrived shortly thereafter.  (Id.)

Another point of contention between Mr. Carrion-Soto's
account of the search of the Lexus and that of the law
enforcement officers concerns the discovery of the kilogram of
cocaine.  The defendant does not contest that after the heroin
was found, Corporal Drummond read him the Miranda warnings from a
card.  (Id. at 107-08.)  According to Mr. Carrion-Soto, however,
after the warnings were read, Sergeant Brown asked Mr.
Carrion-Soto if the vehicle contained any additional contraband,
at which point the defendant informed him about the cocaine under
the passenger seat.  (Id. at 112.)

---

[6]  Mr. Carrion-Soto's testimony regarding the search of the
Lexus is contradicted by the video recording taken by the camera
in Corporal Drummond's vehicle [Ex. 10A].  Although, as
described, supra, the video failed to record the critical moments
that preceded the search of the Lexus, it is clear from the video
that Corporal Drummond asked Ms. Guzman for her license and
registration and asked her to exit the Lexus only after she
provided this information.  Corporal Drummond also can be heard
on the video making a reference to a "wad of money" before he
ever spoke to Mr. Carrion-Soto [id. at 07:26:06].

The Court notes as well that it is highly implausible that a
police officer who suspected that he had detained persons
involved in drug trafficking would, on his own, conduct a search
of a vehicle with his back turned to two potentially dangerous
suspects, particularly when his fellow officers are minutes away.
In light of the factual inaccuracy between Mr. Carrion-Soto's
testimony and the video recording, and the implausibility of his
testimony, the Court does not find credible Mr. Carrion-Soto's
statement that Corporal Drummond conducted a search of the Lexus
before his fellow officers arrived.

Mr. Carrion-Soto also elaborated upon the conversation with Sergeant Brown regarding his cooperation with the government that took place following the discovery of the cocaine.  According to Mr. Carrion-Soto, after the cocaine was discovered and he expressed his interest in cooperating with the government, Sergeant Brown stated to him that "there's a way out of this" if Mr. Carrion-Soto was certain that he wanted to cooperate.  (Id. at 116.)  According to Mr. Carrion-Soto, Sergeant Brown communicated with him in an "aggravated" and "loud" tone of voice during this conversation.  Mr. Carrion-Soto testified that his interpretation of Sergeant Brown's comment was that if he cooperated with the government he would not have to go to jail.  (Id. at 120.)  Specifically, the defendant testified that he thought that the charges for his crimes in South Carolina would be dropped as a result of his cooperation.  (Id. at 150.)  When asked about whether he thought that his cooperation would affect any charges that could be brought against him in New Jersey, however, Mr. Carrion-Soto admitted that he "didn't know anything about New Jersey" and that no one made any promises with regard to his charges in New Jersey.  (Id. at 150-51.)

The defendant's recollection of his meeting with SA Beach differed in several respects from the latter's testimony. Contrary to SA Beach's account, the defendant testified that on June 27, 2006, DEA agents took his fingerprints and photographs

18

before, rather than after, his interview at the DEA office.  (Id.
at 136.)  Consistent with SA Beach's account, Mr. Carrion-Soto
testified that on June 27, no one made any promises or statements
regarding the impact that his cooperation would have on his
charges in New Jersey before or during his interview, although
after the interview, Detective Cruz allegedly indicated that he
did not have to worry about his legal troubles because the
information he had provided was "big."  (Id. at 151.)

## III. DISCUSSION

Defendant has moved the Court to suppress multiple
admissions made by Mr. Carrion-Soto to law enforcement officers
between June 22, 2006 and June 27, 2006[7] and physical evidence
seized during the search of the Lexus on June 22, 2006.
Specifically, Defendant has moved to suppress the following
statements: (1) all admissions made to law enforcement officers
on June 22, 2006; (2) his June 23, 2006 telephone call to SA
Beach; and (3) all admissions made during his June 27, 2006
interview at the DEA's office in Northfield, New Jersey [Docket
Item 30].  Defendant's motion to suppress physical evidence seeks
to suppress "all evidence" derived from "the unconstitutional

---

[7]  In addition, Defendant originally moved to suppress
statements he made to law enforcement officers on July 6, 2006
and June 6, 2007 [Docket Item 30].  Based on the Government's
representation at the suppression hearing on October 16, 2007
that it did not intend to introduce these statements into
evidence, the Court dismissed as moot Defendant's motion as to
these statements.

warrantless search and seizure" that occurred during the June 22, 2006 traffic stop [Docket Item 31].  The Court addresses the motions to suppress admissions and to suppress physical evidence in turn below.

**A.  Motion to Suppress Statements**

**1.  Standards for Admissibility of Confessions**

The defendant seeks to suppress the statements he made to law enforcement officers on the ground that they were obtained involuntarily in violation of his Due Process rights.  In addition, Defendant argues that at least some of his statements were obtained in violation of his Fifth Amendment privilege against self-incrimination under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).  The Court first describes the constitutional parameters within which law enforcement officers must operate when obtaining confessions before addressing the specific statements Defendant seeks to suppress.

**a.  <u>Miranda</u> Requirements**

As the Supreme Court has repeatedly affirmed, under the doctrine of <u>Miranda v. Arizona</u>, "if the police take a suspect into custody and then ask him questions without informing him of [his <u>Miranda</u> rights], his responses cannot be introduced into evidence to establish his guilt." <u>Berkemer v. McCarty</u>, 468 U.S. 420, 429 (1984).  The touchstones for the <u>Miranda</u> rule are the concepts of custody and interrogation.  In determining whether a

20

suspect is in custody, "the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (internal quotations and citations omitted).  The test for custody is measured from an objective standpoint, asking "how a reasonable person in the suspect's situation would perceive his circumstances." Yarborough v. Alvarado, 541 U.S. 652, 662 (2004).  The concept of interrogation for Miranda purposes "refers to any words or actions on the part of the police (other than those normally attendant to an arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  Once the warnings have been given, if a suspect is questioned in the absence of his attorney, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Taque v. Louisiana, 444 U.S. 469, 470 (1980).

     **b.**    **Voluntariness of Confessions**

The statement of a criminal defendant that was obtained as a product of police coercion is deemed to be involuntarily given and is subject to suppression. Arizona v. Fulminante, 499 U.S. 279, 287-91 (1991).  The critical issue for the Court to

determine in assessing whether a statement was given involuntarily is whether the conduct of "law enforcement officials was such as to overcome the will to resist and bring about a confession not freely self-determined." Id. at 288. In other words, coercive police activity is a "necessary predicate to a finding of involuntariness," United States v. Jacobs, 431 F.3d 99, 108 (3d Cir. 2005) (citing Colorado v. Connelly, 479 U.S. 157, 167 (1986)), and there must be a causal connection between the police conduct and the confession. Id. (citing Connelly at 164). The voluntariness of a confession is judged by examining the totality of the circumstances under which it was made, including "the characteristics of the accused and the details of the interrogation." Dickerson v. United States, 530 U.S. 428, 434 (2000) (citation omitted). This totality of the circumstances analysis may also account for "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir. 2002) (quoting Withrow v. Williams, 507 U.S. 680, 693 (1993)). The government bears the burden of proving the voluntariness of a confession by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477, 489 (1972).

     As the Court of Appeals for the Third Circuit has noted, "[i]t is well established that an involuntary confession may

result from psychological, as well as physical, coercion."
Miller v. Fenton, 796 F.2d 598, 603 (3d Cir. 1986) (citations
omitted).  A promise from a law enforcement officer that a
suspect will not be prosecuted if he confesses can constitute
such psychological coercion.  United States v. Jacobs, 431 F.3d
99, 109 (3d Cir. 2005).  However,

> because a law enforcement officer promises something to
> a person suspected of a crime in exchange for the
> person's speaking about the crime does not
> automatically render inadmissible any statement
> obtained as a result of that promise.  Rather, a
> promise - express or implied - is a factor (indeed, a
> potentially significant one) in the totality of the
> circumstances inquiry as to whether a statement was
> voluntary.

Id. (internal quotations and citations omitted).  As is always
the case when assessing whether a confession was made
involuntarily, there must be a causal relationship between the
law enforcement officer's promise and the defendant's confession
to support a finding of involuntariness.  United States v.
Walton, 10 F.3d 1024, 1029-30 (3d Cir. 1993).  "Causation in this
sense is not 'but for' causation . . . but requires an inquiry
into whether the agent's statements were so manipulative or
coercive that they deprived the defendant of his ability to make
an unconstrained, autonomous decision to confess."  Id. (internal
quotations and citations omitted).

### 2.   Defendant's Statements

#### a.   Statements to Sergeant Brown and Corporal Drummond

Defendant's first admissions regarding his illegal activities to law enforcement officers in this matter were his confessions to Sergeant Brown and Corporal Drummond on June 22, 2006, following the search of the Lexus and the defendant's subsequent detention.  As described in detail, supra, after the officers discovered the cocaine in the Lexus, Mr. Carrion-Soto asked to speak with Sergeant Brown, to whom he confessed that the kilogram of cocaine discovered by the officers was his but that the heroin they had uncovered was not.  (Tr. 107.)  He repeated this admission to Corporal Drummond shortly thereafter.  (Id. at 110.)  Sergeant Brown, Corporal Drummond, and Mr. Carrion-Soto all testified that before the defendant made this statement, Corporal Drummond read to Mr. Carrion-Soto the Miranda warnings from a card that Sergeant Brown called a "DEA 13 Form."  (Tr. 92, 107, 186.)  Mr. Carrion-Soto nodded when Corporal Drummond asked him if he understood his rights.  (Id. at 94.)

The Court finds that the defendant's statements to Sergeant Brown and Corporal Drummond were made as a result of a knowing and intelligent waiver by Mr. Carrion-Soto of his Miranda rights, and that the statements were made voluntarily.  The defendant's argument that these confessions were made in violation of his Miranda rights is without merit for two reasons.  First, Mr. Carrion-Soto was not being interrogated when he made these statements.  A conversation initiated by a suspect in

24

circumstances such as these, with no indicia that police coercion induced the suspect to speak, does not constitute interrogation under Miranda because it was not the result of "words or actions on the part of the police (other than those normally attendant to an arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Innis, 446 U.S. at 301.  Since Mr. Carrion-Soto initiated the conversation he now seeks to suppress, it can hardly said to be the product of interrogation.

The second, related ground for denying the defendant's motion is the fact that he waived his rights under Miranda.  The validity of a Miranda waiver turns on whether the "totality of the circumstances reveals both an uncoerced choice and the requisite level of comprehension." United States v. Sriyuth, 8 F.3d 739, 749 (3d Cir. 1996) (internal quotations and citations omitted).  When Mr. Carrion-Soto confessed to Sergeant Brown and Corporal Drummond, he had been advised of his constitutional rights, indicated that he understood those rights, and nonetheless sought to speak with the officers.  Although English is his second language, Mr. Carrion-Soto has excellent communication skills in English, as observed by the officers and confirmed in his testimony herein.  There is nothing in the record to suggest that Mr. Carrion-Soto's choice to initiate the conversation in which he made the admissions in question was the

product of coercion, and indeed, Mr. Carrion-Soto has not alleged that he was coerced into initiating the conversation.  Instead, Mr. Carrion-Soto made a "free and deliberate choice" to speak with law enforcement officers after having been apprised of the rights he would relinquish by speaking and the consequences of abandoning those rights.  United States v. Pruden, 398 F.3d 241, 246 (3d Cir. 2005) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).  In view of the fact that Mr. Carrion-Soto was not being interrogated when he confessed to these officers, and that shortly before confessing, he indicated that he understood the Miranda warnings that had been read to him, these admissions did not run afoul of his Fifth Amendment privilege against self-incrimination.[8]

The Court further finds that Mr. Carrion-Soto's statements to Sergeant Brown and Corporal Drummond were made voluntarily. Among the circumstances that courts look to when assessing the voluntariness of a confession are

> the youth of the accused; his lack of education or low
> intelligence; the lack of any advice to the accused of
> his Constitutional rights; the length of the detention;
> the repeated and prolonged nature of the questioning;
> and the use of physical punishment such as deprivation
> of food or sleep.

---

[8]  The Court rejects Defendant's argument that his waiver of his right to silence was the tainted product of an unlawful search.  As is explained in section B-2, infra, the Court finds that all of the evidence recovered from the Lexus is admissible.

<u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973) (internal quotations and citations omitted).  None of these factors suggests that the defendant's statements to Sergeant Brown and Corporal Drummond were involuntary or coerced.  Mr. Carrion-Soto was thirty-two years old on the date of these confessions, and in TFO Koenig's words, he appeared to be "a pretty sharp guy."  (Tr. 95, 227.)  He had been advised of his constitutional rights approximately thirty minutes before he initiated his conversation with Sergeant Brown, had been detained for approximately an hour when the conversation took place, had not been questioned extensively before he initiated the conversation, and had not been subjected to physical punishment of any sort.  (<u>Id.</u> at 94, 104.)

Most critical to the Court's finding that Mr. Carrion-Soto's admissions to Sergeant Brown and Corporal Drummond were voluntary is the fact that the defendant initiated the conversation with Sergeant Brown.  While the defendant was detained at the time he decided to speak with the officers, nothing about his detention suggests that "coercive police activity" undermined his will to resist and caused him to speak with the officers involuntarily.  <u>Jacobs</u>, 431 F.3d at 108.  <u>See also</u> <u>Fulminante</u>, 499 U.S. at 288.  Instead, it appears that Mr. Carrion-Soto independently concluded that it was in his interest to discuss the possibility of cooperating with Sergeant Brown and Corporal Drummond,

notwithstanding the fact that he had been advised of his
constitutional right to silence and the consequences that
speaking entailed.  <u>Bustamonte</u>, 412 U.S. at 226.  Finally,
Defendant's demeanor on the videotape is consistent with an
individual who was in charge of his own decisions.  The Court
concludes that a preponderance of the evidence in the record
shows that Mr. Carrion-Soto's will had not been overborne by
coercive activity when he spoke with Sergeant Brown and Corporal
Drummond, and thus finds that his confessions to those officers
were made voluntarily and are not inadmissible at trial.

    **b.   Statements to TFO Koenig**

The defendant seeks to suppress the statements he made to
TFO Koenig on June 22, 2006, including his confession at the
scene of the roadside stop and his admissions during the
succeeding interview at the DEA's office later that day.  Mr.
Carrion-Soto contends that his statements to TFO Koenig were not
voluntarily made, arguing that Sergeant Brown's statement to him
that "there's a way out of this" if he cooperated with the
government – made after Mr. Carrion-Soto first admitted to
possessing the cocaine[9] – constituted psychological coercion that
affected the voluntariness of his admission to TFO Koenig.  The

---

    [9] Sergeant Brown testified that Mr. Carrion-Soto initiated
the conversation in which he admitted to possessing the cocaine.
(Tr. at 107.)  Mr. Carrion-Soto did not testify as to who
initiated that conversation.

defendant also points to TFO Koenig's statement at the end of
their interview that "[i]f you f*** me on this, you'll regret it
for the rest of your life" as further indication of the
involuntariness of his confession.  (Id. at 226.)  In addition,
Mr. Carrion-Soto argues that the statements should be suppressed
because TFO Koenig did not issue new Miranda warnings before
questioning him.

The Court finds that the Government has satisfied its burden
in proving the voluntariness of Mr. Carrion-Soto's confessions to
TFO Koenig.  The Court first recognizes that Sergeant Brown's
statement that "there's a way out of this" is an important
consideration in evaluating the voluntariness of the defendant's
statements to TFO Koenig that distinguishes those statements from
his earlier admissions.  This is because "[t]here are certain
promises whose attraction renders a resulting confession
involuntary if the promises are not kept, and the defendant's
perception of what the government agents have promised is an
important factor in determining voluntariness." Walton, 10 F.3d
at 1030 (quoting United States v. Shears, 762 F.2d 397, 402 (4th
Cir. 1985).  Such promises "do not trigger an analysis different
from the totality of the circumstances test," but instead require
that the Court assess the impact of the promise, and "whether the
agent's statements were so manipulative or coercive that they
deprived the defendant of his ability to make an unconstrained,

autonomous decision to confess." <u>Walton</u>, 10 F.3d at 1029-30
(internal quotations and citations omitted); <u>see</u> <u>also</u> <u>Jacobs</u>, 431
F.3d at 110.  If the defendant reasonably interpreted Sergeant
Brown's statement to mean that he could escape prosecution
altogether by cooperating, and if the defendant would not have
confessed to TFO Koenig absent Sergeant Brown's statement, then
Mr. Carrion-Soto's statements to TFO Koenig could be found to be
involuntary and inadmissible.

While recognizing the significance of promises by law
enforcement officers to the voluntariness of a suspect's
confession, the Court finds that the totality of the
circumstances in this case do not suggest that Sergeant Brown's
statement weakened Mr. Carrion-Soto's ability to make an
autonomous decision to confess.  First, even under Carrion-Soto's
version, Sergeant Brown did not promise him that cooperation
would immunize him from all prosecution, and Carrion-Soto could
not have understood Sergeant Brown to be making such a
commitment; that an attempt to truthfully cooperate is viewed
favorably but does not necessarily cause all charges to go away
is widely known and understood by any reasonable suspect in
Carrion-Soto's position.  Mr. Carrion-Soto may have engaged in
wishful thinking, but he could not have failed to understand that
his own words could be used against him if he talked.  This is
again confirmed by the fact that Mr. Carrion-Soto brought up the

possibility of cooperating and admitted to possessing the cocaine
to Sergeant Brown <u>before</u> Sergeant Brown suggested to the
defendant that cooperating was a "way out" of his legal troubles.
His preceding statement to Brown could not have been influenced
by Brown's subsequent mention of a "way out."  Mr. Carrion-Soto's
statements to TFO Koenig – that the cocaine was his and that he
wanted to cooperate – were identical to what he initially
confessed to Sergeant Brown before the latter's statement that
cooperating was a "way out of this."  The continuity between the
defendant's first statement to Sergeant Brown and his later
confessions to TFO Koenig does not indicate that the "defendant's
will was overborne when he confessed" to TFO Koenig, <u>Walton</u>, 10
F.3d at 1028 (citation omitted), but instead suggests that
Sergeant Brown's statement had no discernible impact on the
voluntariness of the defendant's decision to confess.  Even if
Sergeant Brown's "way out" statement is construed as a promise,
which it is not, "the real issue is not whether a promise was
made, but whether there was a causal connection between" the
officer's statement and the defendant's confession, the fact that
Mr. Carrion-Soto admitted to possessing the cocaine before and
after Sergeant Brown's statement undermines his claim that the
statement rendered his later admissions to TFO Koenig
involuntary.  <u>Id.</u> at 1029.

The totality of the remaining circumstances surrounding Mr. Carrion-Soto's statements to TFO Koenig does not support the assertion that his confessions were involuntary.  Mr. Carrion-Soto had been detained for approximately two hours by the time TFO Koenig arrived on the scene, and the succeeding interview lasted no more than two hours.  (Tr. 203, 214.)  Cf. United States v. Jones, 359 F.3d 921, 924 (7th Cir. 2004) (noting that the court had found "two hours of questioning handcuffed in the back of a police car in a remote location not sufficient to find waiver of rights involuntary"); United States v. Haswood, 350 F.3d 1024, 1028 (9th Cir. 2003) ("Even if we assume that the interrogation lasted all day . . . coercion typically involves far more outrageous conduct.").  While Mr. Carrion-Soto was handcuffed during his detainment on the Interstate when TFO Koenig first spoke to him, he was not handcuffed during the interview.  (Tr. 212-13.)  During the interview at the DEA's office, Mr. Carrion-Soto was given access to the restroom, and was not subject to threats[10], physical punishment or tricks by the interviewing officers.  (Id. at 219.)  Moreover, as noted supra, the defendant was, at the time, an adult of apparently

---

[10]  At the end of the interview, TFO Koenig used coarse language to communicate to the defendant that he would "regret it" if he betrayed the trust that the DEA officers had placed in him.  (Tr. 226.)  In light of the fact that TFO Koenig made this comment at the end of the interview, it can hardly be said to have rendered Mr. Carrion-Soto's preceding statements involuntary.  (Id.)

average or above-average intelligence, easily conversing in English.  The circumstances of Mr. Carrion-Soto's interview with TFO Koenig simply do not suggest that his confession was the result of coercive activity that overpowered his will.

The Court also finds that TFO Koenig's questioning of the defendant – both on the side of the Interstate and at the DEA's office – did not violate Mr. Carrion-Soto's privilege against self-incrimination.  The Court of Appeals for the Third Circuit has noted that "Miranda [] does not necessarily require that a suspect be warned anew each time he is questioned." Pruden, 398 F.3d at 246 (citing Guam v. Dela Pena, 72 F.3d 767, 769-70 (9th Cir. 1995), for the proposition that "a fifteen-hour delay between waiver and statement does not require new warning and waiver").  Instead,

> the question of whether a time lapse renders Miranda warnings "stale" may be reduced to answering two questions: (1) At the time the Miranda warnings were provided, did the defendant know and understand his rights? (2) Did anything occur between the warnings and the statement, whether the passage of time or other intervening event, which rendered the defendant unable to consider fully and properly the effect of an exercise or waiver of those rights before making a statement to law enforcement officers?

Pruden, 398 F.3d at 246-47 (citation omitted).

In this case, Corporal Drummond had read the defendant his Miranda warnings less than two hours before TFO Koenig first spoke with the defendant.  (Tr. 94, 203.)  Brown and Koenig both reaffirmed that Carrion-Soto had received and understood his

33

rights to remain silent.  While TFO Koenig did not re-read the
warnings to Mr. Carrion-Soto in their entirety before speaking to
him, he began the conversation with Mr. Carrion-Soto by asking
him if he had been informed of his constitutional rights.  (Id.
at 207-08.)  The defendant indicated to TFO Koenig that he had
been informed of his rights and that he was interested in
cooperating with the government.  (Id.)  The Miranda warnings
Corporal Drummond read to Mr. Carrion-Soto had not expired by the
time TFO Koenig spoke with the defendant.  First, the passage of
time between the delivery of the warnings and TFO Koenig's
questions was less than two hours, far less than intervening
periods that have been upheld as permissible.  See, e.g., Pruden,
398 F.3d at 246.  Moreover, the effect of the warnings was not
undermined by intervening events prior to the defendant's
conversation with TFO Koenig.  The only such event that could
conceivably have impacted the sufficiency of Mr. Carrion-Soto's
waiver in this case was Sergeant Brown's statement that "there's
a way out of this" if Mr. Carrion-Soto cooperated.  The Court has
already explained, supra, its reasoning as to why this comment
had no discernable impact on Mr. Carrion-Soto's inclination to
speak with law enforcement officials.  Moreover, it is not
insignificant that while TFO Koenig did not restate the Miranda
warnings in their entirety before speaking with the defendant, he
confirmed that the defendant recalled and understood his

34

constitutional rights.  See id. at 247-48 (noting the significance of reminding a defendant "of his Miranda rights, albeit without repeating those rights in full").  The Court accordingly concludes that TFO Koenig's questioning of Mr. Carrion-Soto did not violate the defendant's Miranda rights.

### c.    Statements to SA Beach

Mr. Carrion-Soto seeks to suppress the confessions he made to SA beach during his June 23, 2006 telephone call and the June 27, 2006 interview at the DEA's office in Northfield, New Jersey, arguing that the government officers' conduct in both contexts violated the requirements of Miranda and rendered his confessions involuntary.  The Court disagrees.  First, Miranda obviously does not apply to the defendant-initiated telephone call to SA Beach on the evening of June 23, 2006, since the defendant, who made the call on his own from outside of a pizzeria, was clearly not subjected to "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest" at the time he called SA Beach.  Beheler, 463 U.S. at 1125 (internal quotations and citations omitted).

The Court likewise finds that the government has established that Mr. Carrion-Soto's confession to SA Beach during this telephone call was voluntary.  As is explained, supra, notwithstanding the defendant's testimony concerning the impact of Sergeant Brown's statement urging him to cooperate, Mr.

Carrion-Soto's eagerness to cooperate and take responsibility for
the cocaine before Sergeant Brown allegedly made the comment in
question belies his contention that his later confessions were
the product of Sergeant Brown's coercion.  Mr. Carrion-Soto's
allegation that TFO Koenig's statement that he would "regret it"
if he betrayed the DEA's trust rendered his telephone confession
to SA Beach involuntary is equally implausible.  While TFO
Koenig's coarse language was not appropriate, his statement
merely explained the obvious to the defendant – namely, that the
DEA had placed its trust in Mr. Carrion-Soto by permitting him to
be released on personal recognizance despite serious charges, and
that the defendant should not expect that he could betray that
trust with impunity.  See United States v. Sablotny, 21 F.3d 747,
753 (7th Cir. 1994) (noting that "the police did not exceed their
bounds by frightening [the defendant] with the specter of jail, a
prospect of which she must have been well aware in any event").
TFO Koenig's comment, although indelicately phrased, was simply
not the sort of coercive conduct that "overcome[s] the will to
resist and bring[s] about a confession not freely
self-determined." Fulminante, 499 U.S. at 288.  Mr. Carrion-
Soto's expressed interest in cooperating with the government
predated both of the allegedly coercive statements, and was to
all appearances unaffected by those statements.  The Court

accordingly finds that Mr. Carrion-Soto's telephone confession to SA Beach was voluntary.

Finally, the Court finds that Mr. Carrion-Soto's confessions to SA Beach and other law enforcement officers at the DEA's office in Northfield, New Jersey should not be suppressed on either <u>Miranda</u> or voluntariness grounds.  SA Beach testified that he did not read the defendant his <u>Miranda</u> rights at any point before or during the interview on June 27, 2006 because the defendant was not under arrest or in custody.  The Court agrees that Mr. Carrion-Soto was not in custody at any point on June 27 and that SA Beach had no obligation to advise him of his constitutional rights under <u>Miranda</u>.  The Supreme Court's decision in <u>Oregon v. Mathiason</u>, 429 U.S. 492 (1977), is instructive in this regard.  In <u>Mathiason</u>, the Court found that the petitioner had not been in custody as understood by <u>Miranda</u> when he voluntarily went to the police station at a police officer's telephone request in order to answer the officer's questions.  <u>Id.</u> at 495.  As the Court stated,

> there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way.  He came voluntarily to the police station, where he was immediately informed that he was not under arrest.  At the close of a 1/2-hour interview respondent did in fact leave the police station without hindrance.

<u>Id.</u>; <u>see</u> <u>also</u> <u>Yarborough</u>, 541 U.S. at 662 (noting that "custody must be determined based on how a reasonable person in the

suspect's situation would perceive his circumstances"). Among the other factors that are relevant to the issue of custody are whether the suspect is aware of the reason underlying the law enforcement officer's interest in meeting with the suspect, whether the questioning during the meeting is "confrontational and intimidating," and whether the interviewers employ "interrogation tactics" during the interview. Jacobs, 431 F.3d at 107.

These factors all support the Government's argument that Mr. Carrion-Soto was not in custody during his June 27, 2006 meeting with SA Beach. As was the case in Mathiason, Mr. Carrion-Soto arrived voluntarily at the Wal-Mart parking lot to meet SA Beach, and drove in his own vehicle to the DEA office for the meeting. (Tr. 14-16.) Also similar to Mathiason, Mr. Carrion-Soto departed the DEA office on his own after the interview had concluded. (Id. at 21.) SA Beach testified that the defendant's freedom of movement was not constrained while he was at the DEA's office, and that Mr. Carrion-Soto was not handcuffed at any point during the interview. (Id. at 20-21.) Mr. Carrion-Soto was permitted to receive personal telephone calls during the interview. (Id. at 137.) While the defendant testified that the government agents expected "straight" answers and "details" from him at the interview, he did not testify that the tone during the interview was confrontational or that the DEA agents employed

interrogation tactics during the interview.  (Id. at 72.)
Instead, the defendant recalled that everyone spoke in a "normal,
calm tone of voice" during the interview.  (Id. at 89.)
Moreover, the defendant was fully aware that he had been asked to
meet with DEA agents to discuss his drug trafficking activities
and the potential of cooperating with the government – in other
words, in contrast with Jacobs, 431 F.3d at 107, the purpose of
the defendant's meeting with the DEA was known in advance.  (Id.
at 67.)  In short, notwithstanding Defendant's subjective
feelings about the custodial nature of the June 27 interview, the
"objective circumstances" of the interview, Yarborough, 541 U.S.
at 663 (citation omitted), show that Mr. Carrion-Soto was not in
custody.  Accordingly, the DEA agents were not required to inform
Mr. Carrion-Soto of his constitutional rights, and his
confessions during the interview were not made in violation of
his Miranda rights.

        The Court further finds that Mr. Carrion-Soto's confessions
during the interview were made voluntarily.  As is explained,
supra, the Court has already determined that the allegedly
coercive remarks of Sergeant Brown and TFO Koenig had little or
no impact on the voluntariness of the defendant's confessions.[11]

---

        [11]  The defendant testified that after the June 27
interview, Detective Cruz indicated that he did not have to worry
about his legal troubles because the information he had provided
was "big."  (Id. at 151.)  In light of the fact that this remark
was made after the defendant had made the confessions at issue

Moreover, whatever minimal impact such statements might have had at the time they were made, "the time that passe[d] between confessions, the change in place of interrogations, and the change in identity of the interrogators," Oregon v. Elstad, 470 U.S. 298, 310 (1985), further stripped the statements of their allegedly coercive force.  Again, the Court notes that Mr. Carrion-Soto consistently expressed an interest in cooperating and a willingness to confess to possessing the cocaine before and after the statements in question were made.  This unwavering stance is entirely at odds with the defendant's allegation that his will was broken by coercive pressure.

Moreover, the same factors that illustrate the non-custodial nature of the June 27 interview likewise indicate that it was not a coercive environment that forced Mr. Carrion-Soto to confess involuntarily.  The defendant was not handcuffed, was permitted to receive personal telephone calls, was addressed in calm tones without interrogation tactics, and drove himself to and from the DEA's office.  (Tr. 14-16, 20-21, 89, 137.)  When Mr. Carrion-Soto became emotional at the beginning of the interview out of concern for the risk that his cooperation posed to his family, the officers left the room to allow him to compose himself.  (Id. at 18, 147.)  According to SA Beach, the government officers

---

here, Detective Cruz's remark has no bearing on the voluntariness of the confessions that preceded it.

asked the defendant if he wanted to terminate the interview, and he declined the offer.  (Id. at 18.)  The totality of the circumstances of the June 27 interview do not show that police coercion caused the defendant to confess, but instead indicate that Mr. Carrion-Soto's statements were entirely voluntary.

In summary, the Court holds that all of the confessions that the defendant seeks to suppress are admissible.  The law enforcement officers read Mr. Carrion-Soto his Miranda rights when they were required to do so, and the defendant confessed while fully aware of his constitutional right not to speak. Moreover, none of the officers' conduct coerced the defendant to confess when he would otherwise not have done so.  The Court will therefore deny the defendant's motion to suppress the statements he made between June 22, 2006 and June 27, 2006.

## B.  Motion to Suppress Physical Evidence

The defendant has moved the Court to suppress "all evidence" derived from "the unconstitutional warrantless search and seizure" that occurred during the June 22, 2006 traffic stop [Docket Item 31].  The defendant argues that, while Corporal Drummond was authorized in pulling the Lexus over for speeding on the morning of the search, the traffic stop became an unlawful seizure when Corporal Drummond asked Ms. Guzman to exit the vehicle, because at that point there was no basis for the officer to suspect that occupants of the car had been involved in any

unlawful activity apart from driving in excess of the speed limit.  The defendant further argues that while Ms. Guzman consented to the search of the automobile, he did not consent to the search, and so when Corporal Drummond opened the suitcase known to belong to Mr. Carrion-Soto, the search exceeded the scope of the consent the officers received from Ms. Guzman. According to the defendant, the illegal search of his suitcase, in which the officers found the cylinder containing heroin, tainted the remainder of the search of the Lexus, rendering all items recovered after the suitcase was opened the inadmissible fruits of the illegal search.  For the reasons that follow, the Court disagrees with the defendant's ultimate position that the evidence obtained from the search of the Lexus is inadmissible.

### 1.   The Traffic Stop

The Court first explains its finding that the traffic stop, the questions Corporal Drummond posed to Ms. Guzman and Mr. Carrion-Soto, and the request for consent to search the Lexus were lawful.  Under the Fourth Amendment, when police officers lawfully stop a vehicle for a traffic violation and subsequently develop a reasonable and articulable suspicion that the occupants of the car are involved in criminal activity, the officers are permitted to "expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation."  United States v. Givan, 320 F.3d 452, 458 (3d

Cir. 2003).  As the Court of Appeals for the Third Circuit has
explained,

> [w]hile reasonable suspicion must be more than an
> inchoate hunch, the Fourth Amendment only requires that
> police articulate some minimal, objective justification
> for an investigatory stop.  In determining whether
> there was a basis for reasonable suspicion, a court
> must consider the totality of the circumstances, in
> light of the officer's experience.

Id. (internal quotations and citations omitted).  The reasonable
suspicion inquiry "allows officers to draw on their own
experience and specialized training to make inferences from and
deductions about the cumulative information available to them
that might well elude an untrained person."  United States v.
Arvizu, 534 U.S. 266, 273 (2002) (internal quotations and
citations omitted).  Because "questions relating to a driver's
travel plans ordinarily fall within the scope of a traffic stop,"
a police officer is permitted to ask such questions during a
traffic stop, and if the answers give rise to a reasonable
suspicion that criminal activity is afoot, then the subsequent
investigatory stop of the vehicle does not violate the Fourth
Amendment.  Givan, 320 F.3d at 459.

In this case, Corporal Drummond justifiably stopped Ms.
Guzman's Lexus on the morning of June 22, 2006 because she was
speeding.  (Tr. 148.)  When he asked Ms. Guzman for her driver's
license and vehicle registration, Ms. Guzman opened the glove
compartment, in which Corporal Drummond observed, in plain view,

43

a four-inch stack of United States currency bundled into smaller sub-stacks with rubber bands.  (Id. at 150.)  Courts have repeatedly held that "carrying a large sum of cash is strong evidence of some relationship with illegal drugs."  United States v. $67,220.00 in U.S. Currency, 957 F.2d 280, 285 (6th Cir. 1992); see also United States v. Hardwell, 80 F.3d 1471, 1490 (10th Cir. 1996).  Likewise, the packaging of such currency in rubber bands can be a further indication that it is tied to drug trafficking.  United States v. $12,390.00, 956 F.2d 801, 806 (8th Cir. 1992).

Based on his law enforcement experience, Corporal Drummond drew the same conclusion as these courts that the quantity and packaging of the currency was suspicious.  (Tr. 151-52.)  His suspicion was further enhanced by, inter alia, the fact that Ms. Guzman did not know where in Florida they were going, the brevity of their long-distance trip, and by the couple's inconsistent answers to his questions regarding their destination and the length of their relationship.  (Id. at 154-57.)  Inconsistent answers like those given by Ms. Guzman and Mr. Carrion-Soto can enhance an officer's legitimate suspicion about the activities of the vehicle's occupants "so as to enable him to expand the scope of the stop to ask additional, more intrusive, questions."  United States v. Ward, 484 F.3d 1059, 1062 (8th Cir. 2007) (citation omitted).  Within fifteen to twenty minutes of the

44

initial stop, Corporal Drummond asked and received permission from Ms. Guzman to search the vehicle.  (Tr. 85.)  Taking into account the time it took Corporal Drummond to perform activities necessary to the traffic stop – including writing the ticket and entering the information about the Lexus into the "mobile data" unit computer in his vehicle - it is clear that Corporal Drummond extended the time of the stop only minimally in order to follow up on his legitimate suspicions.  (Id. at 158.)  In view of the totality of the circumstances, including the quantity and packaging of the currency, the brevity of the couple's long-distance trip, the fact that Ms. Guzman did not know where in Florida they were going, and the inconsistencies in Ms. Guzman's and Mr. Carrion-Soto's responses to similar questions, Corporal Drummond "was justified in further extending the stop and asking for consent to search the vehicle."  Givan, 320 F.3d at 459.

### 2.    The Search of the Lexus and Mr. Carrion-Soto's Consent

Having found that the extended stop of Lexus was permissible, the Court addresses whether the search of the Lexus that ultimately yielded the evidence in question fell within the scope of the consent that authorized it.  The Fourth Amendment, of course, does not proscribe searches of property or premises when the owner consents to the search, "because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so."  Florida v. Jimeno, 500 U.S. 248, 251

(1991).  A driver of an automobile has "the requisite joint
access and control giving rise to the authority to consent to a
full search of a vehicle."  United States v. Morales, 861 F.2d
396, 399 (3d Cir. 1988) (internal quotations and citations
omitted).  The Supreme Court has held that when the driver of an
automobile consents to a search of the vehicle, this consent
extends to closed containers within the vehicle, because such
containers are reasonably within the scope of the initial
consent.  Jimeno, 500 U.S. at 252.  As the Court reasoned, there
is no need to impose a "superstructure to the Fourth Amendment's
basic test of objective reasonableness" by requiring police
officers to seek item-by-item consent.  Id.  However, because the
driver of a vehicle does not have the authority to consent to the
search of her passenger's belongings, if the police are aware
that a container does not belong to the party that granted
consent, then they cannot search such containers on the basis of
that consent.  See, e.g., United States v. Jaras, 86 F.3d 383,
389-90 (5th Cir. 1996) (citing cases for the proposition that "it
was not objectively reasonable for officer to believe that
driver's consent to search car extended to closed briefcase
because the driver had identified it as belonging to passenger").

In this case, the Government and Mr. Carrion-Soto present
different accounts of whether Corporal Drummond sought the

46

defendant's consent before searching the vehicle.[12]  The Court is
not persuaded by the evidence before it that Mr. Carrion-Soto
consented to the search.  While both Sergeant Brown and Corporal
Drummond testified that they now recall Mr. Carrion-Soto
consenting to the search, the Court finds their testimony on this
issue dubious.  Sergeant Brown testified that he was able to
recall the defendant consenting after he viewed the video from
the traffic stop; according to Sergeant Brown, while the moment
of consent is not captured on the recording, the video reminded
him of the events of that day, including Mr. Carrion-Soto's
consent.  (Tr. 86.)  Corporal Drummond testified that reading his
incident report from the arrest reminded him of the defendant's
consent; according to Corporal Drummond, the report states that
he asked the "same questions" of Mr. Carrion-Soto as he had of
Ms. Guzman, and Mr. Carrion-Soto said "no to all narcotics
questions."  (Id. at 190.)  His report mentioned consent by Ms.
Guzman, and it made no mention of consent by Mr. Carrion-Soto.
Both officers thus appear to have remembered the moment that Mr.
Carrion-Soto consented to the search by reviewing sources that do

_____

[12]  Mr. Carrion-Soto also appears to dispute the
Government's claim that Ms. Guzman consented to the search of the
car, in that he testified that Corporal Drummond initiated the
search within minutes of stopping the car without any other
officer present.  (Tr. 94-96.)  As noted, supra, Mr. Carrion-
Soto's testimony on this subject is contradicted by the video
recording taken from the camera in Corporal Drummond's car, and
is, in any case, implausible.

not in themselves suggest that the defendant did in fact consent.[13]  Moreover, TFO Koenig testified that when he arrived at the scene of the traffic stop, Corporal Drummond and Sergeant Brown only informed him that Ms. Guzman had consented to the search of the car and did not mention Mr. Carrion-Soto's consent. (Id. at 206.)  The defendant himself testified that he did not consent to the search.  (Id. at 96.)  The Court finds that the Government has failed to prove by a preponderance of the evidence that the defendant consented to the search of the automobile.

Ms. Guzman, however, did consent to the search of the car, and the question becomes whether the search that was performed fell within the scope of the consent given, and, if not, if the evidence recovered from the search is nonetheless admissible despite the fact that the search exceeded its scope.

### a.    The Kilogram of Cocaine

The kilogram of cocaine that the officers discovered under the back seat of the Lexus clearly falls within the scope of Ms. Guzman's consent and is admissible.  There is no evidence in the record that Ms. Guzman limited the scope of her consent in any way.  After they received Ms. Guzman's unconditional consent to

---

[13]  The Court does not dispute that it is possible for a witness to stir his or her memory of a specific aspect of an event by reviewing a more general account of that event.  It simply finds, based on evidence such as the testimony of the defendant and TFO Koenig, that the Government has failed to carry its burden of proof on the question of whether Defendant himself consented to the automobile search.

search the Lexus, the officers were entitled to search under the back seat, where the kilogram of cocaine was discovered.  See United States v. Zapata, 180 F.3d 1237, 1243 (11th Cir. 1999) (although "a search exceeds the scope of consent when an officer destroys a vehicle, its parts, or its contents a search does not exceed the scope of consent merely because an officer forces open a secured compartment that reasonably may contain the objects of the search") (citation omitted); United States v. Flores, 63 F.3d 1342, 1362 (5th Cir. 1995) (consent to search automobile permitted officers to unscrew and remove door vent covers).  The kilogram of cocaine found under the rear passenger seat was thus lawfully seized.

### b.    The Heroin in the Suitcase

The Court finds that in the case of Mr. Carrion-Soto's suitcase in the trunk of the Lexus, the search exceeded the scope of Ms. Guzman's consent.  When Corporal Drummond opened the trunk and located two pieces of luggage, he held them up before Ms. Guzman and Mr. Carrion-Soto and asked who the luggage belonged to.  (Tr. 89-90.)  Mr. Carrion-Soto claimed that the suitcase was his, and, without asking for Mr. Carrion-Soto's permission, Corporal Drummond opened the suitcase and discovered the cylinder containing 100 grams of heroin.  (Id. at 90.)  It was not objectively reasonable for Corporal Drummond to assume that Ms. Guzman's consent to search the Lexus extended to a suitcase the

49

officers knew belonged to the defendant, and, accordingly, the search of Mr Carrion-Soto's suitcase was unlawful. <u>Jaras</u>, 86 F.3d at 389-90.

Nonetheless, the Court holds that the heroin in the suitcase is admissible under the doctrine of inevitable discovery. As a general matter, of course, evidence uncovered as a result of an unlawful search is inadmissible under the Fourth Amendment's exclusionary rule. <u>United States v. Burton</u>, 288 F.3d 91, 99 (3d Cir. 2002). However, the doctrine of inevitable discovery "permits the introduction of evidence that inevitably would have been discovered through lawful means, although the search that actually led to the discovery of the evidence was unlawful." <u>United States v. Herrold</u>, 962 F.2d 1131, 1140 (3d Cir. 1992) (emphasis omitted). Underlying the inevitable discovery rule is the notion that "the exclusionary rule ensures that the police should not be in a better position as a result of their illegal action, but neither should they lie in a worse position." <u>United States v. Vasquez De Reyes</u>, 149 F.3d 192, 194 (3d Cir. 1998). To satisfy the requirements of inevitable discovery, the Government must prove by a preponderance of the evidence that "the evidence at issue would have been acquired through lawful means, a burden that can be met if the government establishes that the police, following routine procedures, would inevitably have uncovered the evidence." <u>Id.</u> at 195.

50

The doctrine of inevitable discovery does not permit the court to speculate as to a string of potential developments that might have led to the lawful discovery of the evidence in the absence of the illegal search.  Id.  As the Court of Appeals for the Third Circuit has explained,

> [p]roof of inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings. The exception requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred.

Id. (quoting United States v. Kennedy, 61 F.3d 494, 498 (6th Cir. 1995)).

Taking account of the historical facts in this case on June 22, 2006 as they existed just before Corporal Drummond unlawfully opened Mr. Carrion-Soto's suitcase, the Court finds that the discovery of the heroin was inevitable based on the search of the rest of the car that was already underway.  Although the heroin was discovered before the cocaine, there is absolutely nothing in the record to suggest that the discovery of the heroin had any impact on the subsequent, lawful discovery of the kilogram of cocaine.  Instead, as noted above, Ms. Guzman granted the officers her unconditional consent to search the vehicle, and, in the course of lawfully conducting that search, the officers discovered the cocaine below the back seat.  Based on Corporal

Drummond's testimony about his suspicion of criminal activity –
particularly as a result of the large stack of currency in the
glove compartment – it is hardly speculative for the Court to
conclude that the officers would have completed the search they
had initiated.  (Tr. 154-57.)  Indeed, it would be speculative
for the Court to invent reasons why the officers would have
spontaneously discontinued the search they had received
permission to conduct.

Once the officers found the kilogram of cocaine, it would
have been "utterly inconceivable" for them to ignore the
possibility that the Lexus contained additional contraband.
United States v. Delancy, No. 06-13718, 2007 WL 2846403, at *17
(11th Cir. Oct. 3, 2007).  On the day of the search, Sergeant
Brown was accompanied at the roadside stop by Treez, a dog that
with training in narcotics detection.  (Tr. 112.)  Sergeant Brown
testified that when Treez "alerts" to the presence of narcotics,
she has been proven accurate by the discovery of contraband
between 70% and 80% of the time.  (Id. at 113.)  When Treez was
exposed to the luggage in the trunk of the Lexus, she "alerted"
to the presence of narcotics in Mr. Carrion-Soto's suitcase, but
not Ms. Guzman's duffel bag.  (Id.)  Had Corporal Drummond not
opened the defendant's suitcase, Treez's inspection of the bag
would have indicated to the officers that the bag contained
narcotics without "ris[ing] to the level of a constitutionally

52

cognizable infringement." <u>Illinois v. Caballes</u>, 543 U.S. 405, 409 (2005).  Treez's positive alert to the presence of narcotics in the defendant's suitcase, combined with the kilogram of cocaine and the large quantity of currency in the car, would inarguably have given the officers probable cause to search the suitcase, which would have resulted in the discovery of the heroin.  <u>See id.</u> (noting that the trial court "found that the dog sniff was sufficiently reliable to establish probable cause to conduct a full-blown search of the trunk"); <u>see</u> <u>also</u> <u>Delancy</u>, 2007 WL 2846403, at *17 (noting the inevitability that drugs would be discovered because "the search, after all, involved a drug dog").

It is noted that Treez was at the scene with her human partner, Sergeant Brown, at all relevant times, standing by to sniff around the vehicle if needed.  If the defendant had refused to consent to the search of his suitcase, the normal police practice would have been to lead Treez in and around the vehicle and any packages lying beyond Ms. Guzman's consent to search the vehicle.  Treez would have alerted to the suitcase, just as she actually did during the roadside "luggage lineup" to which Sergeant Brown testified.  (Tr. 113.)

The Court accordingly finds that, although the initial discovery of the heroin in Mr. Carrion-Soto's bag was the product of an unlawful search, the evidence would inevitably have been

discovered by the canine had Corporal Drummond not conducted the illegal search of Defendant's bag.  Because the Fourth Amendment's exclusionary rule does not require that police be placed in a worse position as a result of their illegal actions than they would be had they behaved lawfully, <u>Vasquez De Reyes</u>, 149 F.3d at 194, the heroin discovered in Mr. Carrion-Soto's suitcase is admissible.

**IV.   CONCLUSION**

For the foregoing reasons, the Court holds that all of the evidence that Defendant seeks to suppress is admissible.  The Court therefore will deny Mr. Carrion-Soto's motions to suppress his confessions and the physical evidence recovered from the search.  The accompanying Order will be entered.


**November 7, 2007**                    **s/ Jerome B. Simandle**
Date                                    JEROME B. SIMANDLE
                                        United States District Judge

54